DOCKETED

SEP 2 0 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RNA CORPORATION,                      )
an Illinois corporation,              )
                                      )     **04C   6070**
              Plaintiff,              )
                                      )         ~
     v.                               )     No.          **JUDGE ZAGEL**
                                      )
MOST PRODUCTS, INC., a Michigan       )     JURY TRIAL DEMANDED
corporation, and DAVID THOMASMA,      )
                                      )
              Defendants.             )     **MAGISTRATE JUDGE DENLOW**

## COMPLAINT FOR FRAUD, STATUTORY VIOLATIONS AND OTHER RELIEF

Plaintiff, RNA Corporation ("RNA"), by its undersigned attorneys, makes the following Complaint against the defendants, Most Products Inc. ("MPI") and David Thomasma ("Thomasma"):

### COUNT I

### Parties

1.     RNA is an Illinois corporation, with its principal place of business at 13750 Chatham Avenue, Blue Island, Cook County, Illinois. RNA is, and at all relevant times was, engaged in the business of manufacturing and marketing professional health and beauty aids products. RNA manufactures many such products for other businesses under one or more trade names of such businesses, a process known as "private labeling."

2.     MPI is a Michigan corporation, with its principal place of business at 921 Wakefield Street, Plainwell, Michigan, and formerly (but during events relating to the claims herein) at 326 West Kalamazoo Avenue, Kalamazoo, Michigan. MPI is engaged in the business of manufacturing and marketing professional hair and body care products under various trade names, including

Vitiguard, Hotspell and Absolute Dark. MPI is and since 2002 has been a customer of RNA, for whom RNA manufactured private label products for resale by MPI. MPI is a small company, with roughly six (6) employees.

3.      Thomasma is a resident and citizen of Grand Rapids, Michigan, and is and at all times relevant hereto was the President and the sole shareholder of MPI. Upon information and belief, Thomasma has personally guaranteed certain indebtedness of MPI, which guarantees are in jeopardy as MPI is currently, and at all times relevant was, in poor financial condition and in need of liquid funds.

4.      In his capacity as President and sole owner of MPI, Thomasma enjoyed complete discretion as to whether or not to enter into business in Illinois, or to create and develop a business relationship with RNA. In that same capacity, each and every action of Thomasma described below was made to serve his own personal interests.

**Jurisdiction and Venue**

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is diversity of citizenship between the parties.

6.      Venue for this action is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

2

## Factual Background / Initial Agreement

7.    In or about July 2002, MPI sought to do business with RNA, and in furtherance thereof and in anticipation of revealing to RNA its formulas for various of its products, entered into a certain Confidentiality Agreement with RNA. Thomasma executed that agreement on behalf of MPI as its President. Thereafter, RNA supplied MPI, from time-to-time, with products per its specifications, invoiced MPI therefor, and shipped products to and for MPI, as directed.

8.    In or about August 2002, MPI and RNA entered into negotiations for a requirements contract, whereby RNA would be the exclusive manufacturer of certain products for MPI. To that end, on or about December 31, 2002, MPI and RNA entered into an agreement for RNA to supply all of MPI's requirements for certain of its products, which agreement provided MPI with favorable pricing and other terms (the "Agreement"). In exchange, MPI agreed *inter alia* to purchase such products and pay RNA in accordance with the terms set forth therein.

9.    The Agreement was to be in force for two years, subject at worst to termination upon ninety (90) days written notice. A copy of the Agreement as signed by Thomasma on behalf of MPI is attached as Exhibit A (without exhibits thereto). Up to on or about October 10, 2003, MPI placed and RNA filled orders pursuant to the Agreement (the "Requirements Relationship").

10.    To service the Agreement, at least during the Requirements Relationship, RNA invested in certain equipment, other materials and chemicals which it would not have otherwise purchased but for the Agreement. Further, RNA purchased certain chemicals unique to, and only to be used in, the production of MPI products, from MPI, in the amount of approximately $40,000. Such chemicals were shipped to RNA's facility by MPI, and were paid for by RNA by way of a

3

dollar-for-dollar credit extended to MPI as to product initially shipped to MPI by RNA at the beginning of the Requirements Relationship.

### The First Thomasma Oral Agreement

11.     During the Requirements Relationship, and shortly before September 30, 2003, in a phone call from Thomasma to one of RNA's officers, Thomasma stated that MPI was contemplating altering and/or terminating the Agreement.  In response, RNA's officer told Thomasma that the intent was for the Agreement to be a long-term commitment between MPI and RNA, and that at a minimum MPI was required to give RNA at least ninety (90) days written notice of termination, per the terms of the Agreement. Thomasma stated that his lawyer had told him that MPI did not have to give written notice to terminate the Agreement, but to avoid any dispute, he and MPI would agree to pay for certain research and development, and storage and chemical costs, particularly those chemicals that RNA had agreed to "buy" from MPI for the particular use in manufacturing MPI product (the "First Thomasma Oral Agreement").

12.     Pursuant to and consistent with the First Thomasma Oral Agreement, RNA issued its invoice number 29166 dated September 30, 2003 (the "September 30 Invoice"), reflecting the items that Thomasma and MPI agreed to pay for in the First Thomasma Oral Agreement.  A true and correct copy of the September 30 Invoice is attached hereto as Exhibit B, along with other open and unpaid RNA invoices to and due from MPI, as more fully alleged below.

### MPI's and Thomasma's Anticipatory Breach of the Agreement

13.     The Requirements Relationship terminated on or about October 10, 2003 when RNA received a letter from counsel for MPI, declaring an antecedent breach of the Agreement by virtue of RNA issuing the September 30 Invoice (the "October 10 Letter"), despite that (a) Thomasma had

4

agreed for himself and MPI to honor that invoice in the First Thomasma Oral Agreement, and (b) no written (or other) notice had been received nor cure period allowed as required by paragraph 9 of the Agreement with respect to this purported breach of the Agreement. A true and correct copy of MPI's October 10 Letter is attached as Exhibit C. In the October 10 Letter, MPI demanded the return of all MPI products manufactured by RNA and then stored by RNA for MPI and threatened legal action should RNA not return those products manufactured by RNA for MPI in its possession.

14.    By virtue of the First Thomasma Oral Agreement and the failure of MPI to provide any notice and cure period regarding the September 30 Invoice (even assuming it was not enforceable under the First Thomasma Oral Agreement and/or somehow constituted a breach of the Agreement, which it does not), the October 10 Letter was and is an anticipatory breach of the Agreement by MPI.

## The Second Thomasma Oral Agreement

15.    RNA challenged MPI's anticipatory breach of the Agreement in communications between it and Thomasma, after October 10, 2003. Thereafter, in a phone call from Thomasma to one of RNA's officers, Thomasma and RNA orally agreed to resolve any dispute concerning breach and/or improper termination of the Agreement. Specifically, to resolve any such dispute, Thomasma promised that MPI would immediately pay the September 30 Invoice, in full, provided that RNA promised to fill one or more new, separate MPI orders for private label MPI products, which Thomasma represented and promised that MPI would immediately pay RNA for said order(s) directly upon receiving invoicing for such order(s) from RNA, and further for which Thomasma "guaranteed" prompt payment. Relying on the promises and representations of Thomasma, RNA

5

agreed to the promises made by Thomasma, and therefore accepted the terms of the promises (the "Second Thomasma Oral Agreement").

16.     Pursuant to the Second Thomasma Oral Agreement, MPI placed new separate orders for product, which products RNA shipped, and which products are described in detail on invoices numbers 29311, 29312, 29313 and 29401, which are part and parcel of Exhibit B. Despite placing such orders, which RNA promptly filled and shipped, and for which it issued invoices to MPI, MPI failed and refused to honor said invoices, and MPI and Thomasma failed to honor, and in fact breached, the Second Thomasma Oral Agreement.

## Thomasma's Promissory Scheme Continues

17.     In April 2004, Thomasma traveled to RNA's facility in Blue Island, to *inter alia* seek from RNA and its officers financing for a separate business transaction, which, if successful, Thomasma would stand to gain financially and personally inasmuch as Thomasma could avoid exposure under the above alleged personal guarantees. During this meeting, and before discussing further, RNA's officers questioned Thomasma about the payments due to RNA under the September 30 Invoice and for additional product built and shipped to MPI under the Second Thomasma Oral Agreement.

18.     When confronted with the open invoices, and in particular those set forth in Exhibit B, Thomasma stated that he was surprised they had not been paid, that they were supposed to have been paid, that he would speak to his controller or accounts payable person upon return to Michigan and make sure that the invoices were all immediately paid. Thomasma further confirmed the First and Second Thomasma Oral Agreements by stating his intent to ensure, personally, that those invoices would be honored.

6

### Common Law Fraud by MPI and Thomasma

19.     The statements made by Thomasma, in connection with the formation of the First Thomasma Oral Agreement – that MPI and Thomasma would pay for the items set forth in the September 30 Invoice – were all intentionally and knowingly false representations made to induce RNA to try to avoid claims of anticipatory breach of the Agreement.

20.     The statements made by Thomasma, in connection with the formation of the Second Thomasma Oral Agreement – that MPI committed immediate payment to RNA upon receipt of invoicing for shipments of new orders outside the Agreement, that MPI would immediately pay the September 30 Invoice, and that Thomasma guaranteed payment of such invoices – were also all intentionally and knowingly false representations made to induce RNA to resolve its claim of anticipatory breach of the Agreement, and to induce RNA to agree to build, fill and ship more product to MPI, with the specific intent not to pay the September 30 Invoice or to pay for the new product manufactured by, shipped to and invoiced to MPI.

21.     Upon information and belief, the statements, promises and misrepresentations by Thomasma which are part and parcel of the both the First and Second Thomasma Oral Agreements were intended to (a) avoid financial exposure to MPI under the Agreement, (b) obtain the return of product from RNA pursuant to the Agreement, without paying for same, and (c) obtain new product, without paying for the same, all for the benefit of Thomasma to avoid personal exposure under the above alleged personal guarantees and to enhance the financial viability of his wholly owned company, MPI. RNA reasonably and justifiably relied upon such promises, in part to be paid for amounts due and owing to it in the September 30 Invoice, and in part to recoup its investment in the equipment it had purchased specifically to perform under the Agreement.

22.    The statements made by Thomasma at the April meeting at RNA, like those made by Thomasma in connection with both the First and Second Thomasma Oral Agreements, were also all intentionally and knowingly false representations made to induce RNA and/or its officers to avoid collection activities against Thomasma and consider investing additional capital in business ventures that would benefit Thomasma, to further avoid claims of anticipatory breach of the Agreement. RNA reasonably and justifiably relied upon such promises, by at least delaying its efforts to enforce collection of the amounts due under the open invoices attached as Exhibit B.

23.    The misrepresentations of Thomasma and MPI made in connection with the formation of both the First and Second Thomasma Oral Agreements, and those made at the April meeting at RNA, constitute common law fraud in Illinois, as: (a) they were knowingly false misrepresentations; (b) they were material to RNA in entering into said agreements and/or delaying its enforcement activities, in that but for said misrepresentations, RNA would have pursued its claims under the Agreement and the applicable Uniform Commercial Code, and would not have entered into either oral agreement, under which RNA invested more time, effort and expense to build for and ship to MPI the new, additional orders set forth on the non-September 30 invoices attached as Exhibit B, and further would have pursued earlier the collection of its open invoices; (c) they were made by Thomasma and MPI to induce RNA to so act or omit; (d) they were reasonably and justifiably relied upon by RNA; and (e) such reliance resulted in significant damages to RNA.

24.    RNA has been damaged by virtue of these misrepresentations, in that in addition to foregoing its above-stated claims at the time of, and by entering into, the First and Second Thomasma Oral Agreements, RNA would not have invested more time, effort and expense to build for and ship to MPI the new, additional orders set forth on the non-September 30 invoices attached

as Exhibit B, which total $77,813.04, and further would have pursued earlier the collection of its open invoices.

25.    These continuing misrepresentations described above constitute a pattern of conduct whereby Thomasma, despite the above-referenced financial difficulties of MPI, continued making promises neither he nor MPI had any intention of keeping.  Aware of RNA's substantial investment in the manufacture of MPI products, as shown in the September 30 Invoice, relying on RNA's desire to recoup the costs of said investment, and due to MPI's poor financial condition and lack of liquid funds, Thomasma devised this scheme by which to defraud RNA, which involved making misrepresentations concerning MPI's willingness and ability to pay for said investment and past and future product.   On no less than three separate occasions, Thomasma employed this scheme by making the above-described misrepresentations to accomplish the fraud, repeatedly making promises to pay the amounts represented in the September 30 Invoice immediately, and failing each time.

26.    The statements and misrepresentations by Thomasma and MPI were wilful, wanton and committed with malice aforethought, and RNA is entitled to punitive damages in an amount to be determined, but at least twice the damages it has suffered.

27.    RNA is entitled to prejudgment interest pursuant to the Illinois Interest Act, 815 ILCS 205/2.

WHEREFORE, plaintiff, RNA Corporation, respectfully requests that this Court enter judgment in its favor, and against the defendants, Most Products Inc. and David Thomasma, jointly and severally, in an amount to be determined at trial, but at least $77,813.04, plus incidental damages, punitive damages, attorney's fees, costs, interest, and such other and further relief as this Court deems just and proper.

9

## COUNT II
### (Breach of the First and Second Thomasma Oral Agreement)

28.     For paragraph 28 of Count II of its Complaint, RNA incorporates paragraphs 1 - 18 of Count I by reference as though fully set forth herein.

29.     Implied in every contract in Illinois – including the First and Second Thomasma Oral Agreements – is a covenant of good faith and fair dealing, which requires contracting parties to act in good faith towards each other, and requires parties to a contract who are vested with discretion under that contract to exercise that discretion reasonably, in good faith, and with proper motive, and not arbitrarily, capriciously, or in a manner inconsistent with the parties' reasonable expectations.

30.     MPI and Thomasma have breached the First and Second Thomasma Oral Agreements by failing to pay the September 30 Invoice, and by failing to pay the other invoices set forth in Exhibit B, in a total amount of at least $77,813.04.

31.     RNA has performed all of the material conditions required of it under the First and Second Thomasma Oral Agreements.

32.     RNA is entitled to prejudgment interest pursuant to the Illinois Interest Act, 815 ILCS 205/2.

WHEREFORE, plaintiff, RNA Corporation, respectfully requests that this Court enter judgment in its favor, and against the defendants, Most Products Inc. and David Thomasma, jointly and severally, in an amount to be determined at trial, but at least $77,813.04, plus incidental damages, costs, interest, and such other and further relief as this Court deems just and proper.

## COUNT III
## (Account Stated Against MPI and Thomasma)

33.    For paragraph 33 of Count III of its Complaint, RNA incorporates paragraphs 1 - 18 of Count I by reference as though fully set forth herein.

34.    RNA regularly sent to MPI statements of its account with RNA throughout the Requirements Relationship, which were paid in full. Similarly, after the First and Second Thomasma Oral Agreements, additional invoices were sent, and retained by MPI, including those non-September 30 invoices attached as Exhibit B.

35.    Despite receipt of the invoices attached to the Complaint as Exhibit B, MPI and Thomasma have failed and refused to pay said invoices, nor have either, or anyone acting on their behalf, such as counsel who authored the October 10 Letter, objected to the amounts set forth in the invoices set forth in Exhibit B.

36.    As to the September 30 Invoice, by virtue of the First and Second Thomasma Oral Agreements, MPI and Thomasma have additionally acquiesced to the accuracy and validity of said Invoice, and specifically agreed to pay it in full.

37.    As such, an account has been stated between RNA, on one hand, and MPI and Thomasma, on the other hand, which account is now due and owing, in the full amount of $77,813.04.

38.    RNA is entitled to prejudgment interest pursuant to the Illinois Interest Act, 815 ILCS 205/2.

WHEREFORE, plaintiff, RNA Corporation, respectfully requests that this Court enter judgment in its favor, and against the defendants, Most Products Inc. and David Thomasma, jointly

and severally, in an amount to be determined at trial, but at least $77,813.04, plus costs, interest, and such other and further relief as this Court deems just and proper.

## COUNT IV
## (UCC § 2-709)

39.    For paragraph 39 of Count IV of its Complaint, RNA incorporates paragraphs 1 - 18 of Count I by reference as though fully set forth herein.

40.    At all times pertinent, there was in force and effect a statute known as section 2-709 of the Illinois Uniform Commercial Code, 810 ILCS 5/2-709, which provides that a seller may recover, together with its incidental damages, the price of goods accepted by the buyer who refuses to pay for such goods as they become due.

41.    As a proximate result of Thomasma's and MPI's refusal to pay for goods from RNA as they became due, RNA incurred damages that totaled $77,813.04, and incidental damages including the cost of the materials and warehouse space secured for the MPI production, and the cost of the unused, specially blended chemicals specifically purchased for MPI production, in a total amount that exceeds $40,000.

WHEREFORE, plaintiff, RNA Corporation, prays that this Court enter judgment in its favor and against the defendants, Most Products Inc. and David Thomasma, jointly and severally, in an amount to be determined by the trier of fact but in no event less than $77,813.04 pursuant to 810 ILCS 5/2-709, plus incidental damages, prejudgment interest, costs of suit and such other and further relief as this Court deems just and proper.

12

## COUNT V
## (UCC § 2-708)

42.      For paragraph 42 of Count V of its Complaint, RNA incorporates paragraphs 1 - 18 of Count I by reference as though fully set forth herein.

43.      At all times pertinent, there was in force and effect a statute known as section 2-708 of the Illinois Uniform Commercial Code, 810 ILCS 5/2-708, which allows for the recovery of lost profits and incidental damages from a buyer who repudiates the contract.

44.      As a proximate result of Thomasma's and MPI's repudiation of the First and Second Thomasma Oral Agreements, RNA has lost the profits it reasonably expected to make from full performance of the First and Second Thomasma Oral Agreements by Thomasma and MPI, in an amount to be determined by the trier of fact, and in reliance upon which RNA incurred significant expenses, including for the equipment, chemicals and warehouse space it invested in to meet the production and shipping requirements of MPI.

WHEREFORE, plaintiff, RNA Corporation, prays that this Court enter judgment in its favor and against defendants, Most Products, Inc. and David Thomasma, in an amount to be determined by the trier of fact to reasonably compensate it for the profits lost as a consequence of MPI's repudiation of the Agreement pursuant to 810 ILCS 5/2-708(2), plus its incidental damages, prejudgment interest, costs of suit, and such other and further relief as this Court deems just and proper.

13

## COUNT VI
## (Unjust Enrichment)

45.     For paragraph 45 of Count VI of its Complaint, RNA incorporates paragraphs 1 - 18 of Count I by reference as though fully set forth herein. This Count VII is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(e)(2).

46.     Thomasma and MPI, by their failure and refusal to fully pay for goods provided to them by RNA, have unjustly obtained the benefit of the possession and/or sale of said goods to the detriment of RNA.

47.     Thomasma's and MPI's retention of the benefits of the goods provided to them by RNA violates the fundamental principles of justice, equity, and good conscience.

48.     RNA has been damaged by Thomasma's and MPI's unjust retention of the benefits of the goods provided in the amount of $77,813.04.

49.     Pursuant to 815 ILCS 205-2, due to the vexatious delay in Defendant's failure to make payment, Plaintiff is entitled to prejudgment interest in the statutory amount of 5% per annum.

WHEREFORE, plaintiff, RNA Corporation, respectfully requests that this Court enter judgment in its favor, and against the defendants, Most Products Inc. and David Thomasma, jointly and severally, in an amount to be determined at trial, but at least $77,813.04, plus costs, interest, and such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands trial by jury.

Respectfully submitted,

**RNA CORPORATION**

By: _____
One of Its Attorneys

Frederic A. Mendelsohn
ARDC No. 06193281
Daniel S. Klapman
ARDC No. 06243250
Schoenberg, Fisher, Newman & Rosenberg, Ltd.
222 South Riverside Plaza, Suite 2100
Chicago, Illinois 60606
312-648-2300

F:\dsk\RNA\pleadings\Complaint.wpd

MOST PRODUCTS, INC.
CONTRACT MANUFACTURING AGREEMENT

**THIS AGREEMENT** is made and entered into this ___31___ day of _December_,
2002, by and between Most Products Inc., a Michigan corporation having its principal
place of business at 326 W. Kalamazoo Ave, Kalamazoo MI. 49007 (hereinafter
referred to as Most Products Inc), and RNA, an Illinois corporation, (hereinafter referred
to as RNA).

WHEREAS, RNA is in the business of manufacturing and marketing professional
health and beauty aid products worldwide; and

WHEREAS, Most Products Inc. markets professional hair products under the
trademarks_____
_____       (hereinafter, the "Products"); and

WHEREAS, RNA is in the business of contract manufacturing and packaging of
hair products under the private labels of its customers; and

WHEREAS, RNA is desirous of contract manufacturing and packaging the
Products of Most Products Inc. under the terms and conditions below.

NOW, THEREFORE, the parties for adequate consideration agree as follows:

1.    CONTRACT MANUFACTURING AND PACKAGING

(a) Most Products Inc. hereby engages RNA to manufacture and package
the Products using the formulas developed by Most Products Inc. and/or
approved by Most Products Inc., identified in Attachment "A" to this
Agreement.

(b) RNA accepts the undertaking to manufacture and package the Products in
accordance with the terms and conditions of this Agreement.

(c) RNA agrees to accept and store in secure and safe facilities all necessary
packaging components for the manufacture and packaging of the Products,
without additional cost to Most Products Inc. Most Products Inc. shall be
solely responsible for the cost of the packaging components, including
shipping costs to RNA docks.

2.    SPECIFICATIONS

    (a) RNA shall manufacture and package the Products in accordance with the specifications, procedures and standards supplied by Most Products Inc.

    (b) RNA shall be responsible for insuring that all materials used in the manufacture and packaging of the Products comply with the specifications procedures and standards supplied by Most Products Inc. in accordance with Federal and State laws.

    (c) RNA shall reimburse Most Products Inc. all costs incurred for any Products not in compliance with any specifications, procedures and standards supplied by Most Products Inc, to the extent that any products are unsaleable or have reduced value.

    (d) RNA shall make available for collection of the finished Products only such individuals or shippers as Most Products Inc. may direct.

3.    PURCHASE OF PRODUCT

    (a) From time to time during the course of this Agreement, Most Products Inc. shall place orders with RNA for the manufacturing, packaging and shipping of the Products. All such orders shall be in writing, or by facsimile transmission. Orders shall be shipped by RNA F.O.B. destination, freight collect.

    (b) Most Products Inc. shall pay RNA for manufacturing and packaging in accordance with the prices established in the Purchase Order annexed hereto and marked Attachment "B".

    (c) The prices and payment terms set forth on Attachment "C" shall remain in effect except for adjustments to the prices due to demonstrated increases of direct manufacturing costs (including component purchases) or packaging costs of the respective Products. In no event, however, shall a price increase be effective until ninety (90) days after Most Products Inc. has received written notification and justification of such price increase. In addition, the prices in Attachment "C" are contingent upon RNA manufacturing all products required by Most Products Inc. in the categories contained in Attachment "C". In the event that Most Products Inc. elects not to purchase all their required products as described above from RNA, then RNA may add to the remaining products that they do manufacture pursuant to this agreement and Most Products Inc. shall pay to RNA an amount equal to __% of the cost of said products.

4.    FORMULA CONSISTENCY

(a) RNA shall manufacture and package the Products so that the Products will
be consistent with each previously accepted batch.  To assure this
consistency.  RNA will diligently and meticulously follow the written
instructions, specifications, procedures and standards supplied by Most
Products Inc.  RNA's formulations of the Products shall not change in any


respects, unless consented to in writing by Most Products Inc.

(b) RNA understands and assumes full responsibility for any damages to
Most Products Inc. as a result of any unauthorized modifications,
deviations, or errors in formulation of the Products.  RNA shall credit
Most Products Inc. for the return of non-conforming Products, including
the costs of the manufacture and packaging of the Products and costs of
the packaging components.

5.    FORMULATION RECORDS AND REPORTS

(a) RNA shall maintain adequate records on its chemical processing,
formulation, packaging and quality control of the Products.  Such records
shall be open to inspection of Most Products Inc.

(b) RNA shall retain three (3) samples from each batch of Products.  One (1)
sample shall be forwarded to Most Products Inc. and two (2) samples shall
be retained by RNA's Quality Control Department.

(c) RNA shall indemnify Most Products Inc. in connection with its record
keeping and quality control of the chemical processing, manufacturing and
packaging process.

(d) Most Products Inc. shall be responsible for any component specifications
it provides to RNA with respect to the Products and shall indemnify RNA
for any defects in the component specifications, except for damages
resulting from RNA's failure to strictly adhere to such specifications in the
quality control, chemical processing, manufacturing and packaging
processes.

6.    INSURANCE WARRANTIES AND INDEMNIFICATION

(a) RNA hereby agrees to insure the Products manufactured and packaged for
Most Products Inc. and shall furnish Most Products Inc. with Certificates
of Insurance with acceptable coverage of at least $1,000,000 per
occurrence, including a Broad Form Vendors' Certificate.  RNA shall

name Most Products Inc. as an additional insured under said policy. If such policy is a "claims made" policy as opposed to an "occurrence" policy, RNA shall, at the end of each term, procure and necessary "tail coverage" which shall cover Most Products Inc. for all Products produced by RNA under this Agreement.

(b) RNA hereby warrants and agrees that no Products produced and/or filled and shipped by it shall be adulterated within the meaning of the Federal Food, Drug and Cosmetic Act.

(c) Except for Most Products Inc. responsibility for component specifications as set forth in Section 5 (d) above, RNA hereby agrees and assumes responsibility for (i) the merchantability, efficacy, package ability, stability and shelf life of the Product; (ii) the freedom from adulteration at the time of delivery and the safety for the purposes intended, efficacy of all ingredients, and raw materials; (iii) the compliance of the Products with the provisions of the Food, Drug and Cosmetic Act covering safety, efficacy and adulteration; (iv) the compliance of the Products with any contractual obligations or warranties as to the safety for the purposes intended and efficacy; and (v) indemnifying and holding Most Products Inc. harmless against all claims, costs, expenses, including attorney fees and costs which Most Products Inc. may incur in connection with any liability claim connected with the manufacture or packaging of the Products. Specifically excluded hereunder shall be any claims of misbranded or mislabeled Products, unless such relates to the warranties expressly stated herein by RNA.

7.   CONFIDENTIALITY

RNA and Most Products Inc. covenant and agree to maintain the secrecy and confidentiality with respect to the proprietary information relating to all patents, formulas, trademarks, copyrights, specifications, procedures and other proprietary information of the other (herein after, "Confidential Information") and to refrain from disclosing or using such Confidential Information without the other party's explicit written consent, unless otherwise ordered by a court after prior notice to the other party. The parties acknowledge that monetary damages alone would be inadequate to remedy a breach of this provision and both parties shall be entitled to injunctive relief to enjoin a violation hereof. RNA acknowledges that the formulas, trademarks, copyrights, specifications and procedures relating to the Products are the Confidential Information of Most Products Inc.

8.    COMPLIANCE WITH LAW

RNA shall comply with all federal, state and local laws and regulations in the operation of its contract manufacturing and packaging business and shall indemnify and hold Most Products Inc. harmless with respect to any claims or actions filed in connection therewith, including but not limited to RNA's receipt, storage, use and/or disposal of "Hazardous Substances". RNA shall

maintain, in accordance with federal, state and local laws and regulations required and appropriate material safety data sheets ("MSDS") on each of the Products and make the same available to Most Products Inc. and/or its customers upon request.

9.    TERM

This Agreement shall commence on the date of execution hereof and continue for a period of Two (2) years. The Agreement shall be automatically renewed for additional one-year terms, unless either party has served notice of termination in writing on the other party within ninety (90) days of the end of the ensuing term. Either party may terminate this Agreement during the term for any reason by giving the other party at least ninety (90) days advance notice in writing.

In the event that there is a breach of this agreement by either party that is not cured within 30 days of written notice the non breaching party may terminate this agreement without further notice.

Upon termination of the Agreement, RNA shall immediately release to Most Products Inc. all remaining inventory of packaging and other components for the Products. RNA shall be entitled to payment for the manufacture and packaging of all acceptable finished Products as of the effective date of termination.

10.    ASSIGNMENT

Neither party shall assign this Agreement or in any rights or duties under this Agreement to another party without the written consent of the other party.

11.    ENTIRE AGREEMENT

(a) This Agreement integrates all prior representations and agreements of the parties and is the complete and exclusive evidence of the terms of the agreement between them.

(b) This Agreement may not be amended, changed or modified except in writing and signed by the party to be charged by the amendment, change or modification.

12. <u>GOVERNING LAW</u>

This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Michigan, with exclusive jurisdiction and venue in the federal or state courts of Kalamazoo County, Michigan.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date set forth above.

MOST PRODUCTS, INC.

By: _____

_____                    President
ATTEST

RNA

By: _____

_____                    President
ATTEST

Invoice Number:
29166

Invoice Date:
Sep 30, 2003

**Page:**
1

Sold To: MOST PRODUCTS INC.          Ship to:
921 WAKEFIELD STREET
PO BOX 375
PLAINWELL, MI   49080

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | | UPON RECEIPT | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | | | 10/30/03 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| | | FINISHED GOODS IN DRUMS... | | |
| 200.00 | | LBS   ABSOLUTE DARK | 1.11 | 222.00 |
| | | DRUM | | 20.00 |
| 250.00 | | LBS   VITAGUARD | 0.61 | 152.50 |
| | | DRUM | | 20.00 |
| 450.00 | | LBS HOT SPELL | 0.99 | 445.50 |
| | | DRUM | | 20.00 |
| | | COMPONENT WAREHOUSING | | |
| 146.00 | | DAYS  56 PALLETS AT .50 | 28.00 | 4,088.00 |
| | | PER DAY | | |
| | | R&D EXPENSES | | |
| 24.00 | | FORMULAS CONVERTED | 500.00 | 12,000.00 |
| 24.00 | | STABILITY TEST | 250.00 | 6,000.00 |
| | | FREIGHT OUT CHARGES | | |
| 56.00 | | PALLETS FOR LABOR AND | 5.00 | 280.00 |
| | | PAPERWORK | | |
| | | UNPAID FREIGHT CHARGES | | 291.53 |
| | | SEE INVOICE 24700 | | |
| | | ALL UNIQUE CHEMICALS | | |
| | | PURCHASED FOR MOST WILL BE | | |
| | | INVOICED ON OCTOBER 8, | | |

|  | |
|---|---|
| Subtotal | |
| Sales Tax | Continued |
| Total Invoice Amount | Continued |
| Payment Received | Continued |
| **TOTAL** | Continued |

Check No:

September 30, 2003

Invoice Number:
29166

Invoice Date:
Sep 30, 2003

**Page:**
5

Sold To:  MOST PRODUCTS INC.
921 WAKEFIELD STREET
PO BOX 375
PLAINWELL, MI   49080

Ship to:

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | | UPON RECEIPT | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | | | 10/30/03 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| | | 2003. | | |

| | | |
|---|---|---|
| Subtotal | | |
| Sales Tax | | |
| Total Invoice Amount | | 30,206.11 |
| Payment Received | | 0.00 |
| **TOTAL** | | 30,206.11 |

Check No:

September 30, 2003

Invoice Number:
29311

Invoice Date:
Dec 12, 2003

**Page:**
1

**Sold To:** MOST PRODUCTS INC.
921 WAKEFIELD STREET
PO BOX 375
PLAINWELL, MI   49080

Ship to: XELA PACK
8300 BOETTNER ROAD
BRIDGEWATER, MI   48115

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | 991645 | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | MAVERICK TRUCKING | 12/2/03 | 1/11/04 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1.00 | SKID | SKID<br>B/L   075403 | 7.50 | 7.50 |

| | |
|---|---|
| Subtotal | |
| Sales Tax | |
| Total Invoice Amount | 1,906.50 |
| Payment Received | 0.00 |
| **TOTAL** | 1,906.50 |

Check No:

December 12, 2003

Invoice Number:
29312

Invoice Date:
Dec 12, 2003

**Page:**
1

Sold To: MOST PRODUCTS INC.          Ship to:
921 WAKEFIELD STREET
PO BOX 375
PLAINWELL, MI  49080

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | 991642 | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | MAVERICK TRUCKING | 12/2/03 | 1/11/04 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 83.00 | | SHIPPERS | 0.70 | 58.10 |
| 4.00 | SKID | SKID | 7.50 | 30.00 |
| | | B/L   075503 | | |

|  | Subtotal | |
|---|---|---|
| | Sales Tax | |
| | Total Invoice Amount | 7,064.78 |
| Check No: | Payment Received | 0.00 |
| | **TOTAL** | 7,064.78 |

December 12, 2003

Invoice Number:
29313

Invoice Date:
Dec 12, 2003

**Page:**
1

Sold To: MOST PRODUCTS INC.                  Ship to:
921 WAKEFIELD STREET
PO BOX 375
PLAINWELL, MI  49080

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | 991642 | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | WATKINS | 12/9/03 | 1/11/04 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 5,690.00 | MOST-FG-01808 | ABSOLUTE HEAT 8OZ | 1.20 | 6,828.00 |
| 2,665.00 | MOST-FG-06408 | SIMPLICITY 8.5OZ | 1.02 | 2,718.30 |
| 5,426.00 | MOST-FG-11208 | PM CHARMINGLY DARK 8OZ | 1.05 | 5,697.30 |
| 900.00 | MOST-FG-01600 | 2 DRUMS  ABSOLUTE DARK 450# | 1.63 | 1,467.00 |
| 324.00 | | SHIPPERS | 0.70 | 226.80 |
| 14.00 | SKID | SKID | 7.50 | 105.00 |
| | | B/L  076503 | | |

|  | | |
|---|---|---|
| Subtotal | | |
| Sales Tax | | |
| Total Invoice Amount | | 23,976.00 |
| Payment Received | | 0.00 |
| **TOTAL** | | 23,976.00 |

Check No:

December 12, 2003

# Invoice

Invoice Number:
**29401**

Invoice Date:
**Feb 10, 2004**
Page:
**1**

Sold To: **MOST PRODUCTS INC.**
921 **WAKEFIELD STREET**
**PO BOX 375**
**PLAINWELL, MI   49080**

Ship To

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| MOST | 991642   991652 | Net 30 Days | |
| Sales Rep | Shipping Method | Ship Date | Due Date |
| | WATKINS MOTOR LINES | 2/9/04 | 3/11/04 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 4,751.00 | MOST-FG-LOADED | ABSOLUTE LOADED 8OZ | 1.41 | 6,698.91 |
| 7,513.00 | MOST-FG-10108 | ISL HEAT RUM PUNCH 8OZ | 0.95 | 7,137.35 |
| 47.00 | MOST-FG-10199 | ISL HEAT RUM PUNCH 128OZ | 9.88 | 464.36 |
| 9.00 | SKID | SKID | 7.50 | 67.50 |
| | | B/L 07104 | | |

|  | Subtotal | 14,368.12 |
|---|---|---|
| | Sales Tax | |
| | Total Invoice Amount | 14,368.12 |
| Check/Credit Memo No: | Payment/Credit Applied | |
| | TOTAL | $14,368.12 |

# PRASHER LAW GROUP, PLC

### ATTORNEYS AT LAW

GREGORY G. PRASHER
E-MAIL:
greg@prasherlaw.com
WEB PAGE:
www.prasherlaw.com

MAIN OFFICE
THE STEEPLEVIEW BUILDING
429 TURNER NW
GRAND RAPIDS, MI 49504
TEL: 616-454-7780
FAX: 616-454-2232

October 10, 2003

John Harms
RNA Corporation
13750 South Chatham Street
Blue Island, IL 60406

Re: Most Products Inc. v. RNA Corporation

Dear Sir:

Under the terms of the agreement your company has with Most Products Inc. dated December 31, 2002 you are required, upon termination of the agreement, to "immediately release to Most Products Inc. all remaining inventory of packaging and other components for the products". This agreement has been terminated by Most Products Inc. because of your company's persistent breach of the requirements of the contract. As a result you are required to immediately return all of the Most Products materials currently in your possession and without trying to extort monies for such things as warehousing costs not contemplated by the contract. Your invoice to Most Products dated September 30, 2003 is contrary to the terms and provisions of the contract with Most Products Inc.

You are hereby directed to release all of the Most Products components in your company's possession no later than Friday, October 17, 2003. Failure to do so will subject your company to an immediate lawsuit for conversion, breach of contract and multiple statutory damages.

I trust that action will not be necessary.

Very truly yours,

Gregory G. Prasher

GGP/bjs
Cc: Dave Thomasma

NORTH OFFICE
4270 PLAINFIELD AVENUE

EAST OFFICE
835 FAIRVIEW AVENUE

WEST OFFICE
4095 CHICAGO DR. SW

DOCKETED

SEP 2 0 2004

JUDGE ZAGEL

MAGISTRATE JUDGE DENLOW

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet 04C 6070

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s): RNA Corporation** | **Defendant(s):Most Products, Inc. David Thomasma** |
| County of Residence: Cook | County of Residence: |
| Plaintiff's Atty: Frederic A. Mendelsohn Schoenberg, Fisher, Newman & Rosenberg, Ltd. 222 S. Riverside Plaza, Suite 2100, Chicago, IL 60606 312-648-2300 | Defendant's Atty: |

CLERK U.S. DISTRICT COURT  04 SEP 17 PM 3: 22  FILED FOR DOCKETING EO-7

II. Basis of Jurisdiction:      **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties (Diversity Cases Only)
               Plaintiff:- **N/A**
               Defendant:- **N/A**

IV. Origin :      **1. Original Proceeding**

V. Nature of Suit:      **190 Other Contract**

VI.Cause of Action:      **Illinois Uniform Commercial Code 810 ILCS 5/2-708 and 5/2-709. Claim for common law fraud, breach of contract, account stated, and unjust enrichment.**

VII. Requested in Complaint
        Class Action:
        Dollar Demand:
        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____ 9/17/04 _____

**DOCKETED**

SEP 20 2004

**JUDGE ZAGEL**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

## 04C 6070

In the Matter of

RNA Corporation

v.

Most Products, Inc. and David Thomasma

Case Number: **MAGISTRATE JUDGE DENLOW**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff, RNA Corporation

| **(A)** | | **(B)** | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME  Frederic A. Mendelsohn | | NAME  Daniel S. Klapman | |
| FIRM  Schoenberg, Fisher, Newman & Rosenberg, Ltd. | | FIRM  Same | |
| STREET ADDRESS  222 S. Riverside Plaza, Suite 2100 | | STREET ADDRESS | |
| CITY/STATE/ZIP  Chicago, IL 60606 | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER  312-648-2300 | FAX NUMBER  312-648-1212 | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS  Fred.Mendelsohn@sfnr.com | | E-MAIL ADDRESS  Dan.Klapman@sfnr.com | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  06193281 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  06243250 | |
| MEMBER OF TRIAL BAR? | YES ☑  NO ☐ | MEMBER OF TRIAL BAR? | YES ☑  NO ☐ |
| TRIAL ATTORNEY? | YES ☑  NO ☐ | TRIAL ATTORNEY? | YES ☐  NO ☑ |
| | | DESIGNATED AS LOCAL COUNSEL? | YES ☐  NO ☑ |
| **(C)** | | **(D)** | |
| SIGNATURE | | SIGNATURE | |
| NAME | | NAME | |
| FIRM | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? | YES ☐  NO ☐ | MEMBER OF TRIAL BAR? | YES ☐  NO ☐ |
| TRIAL ATTORNEY? | YES ☐  NO ☐ | TRIAL ATTORNEY? | YES ☐  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐  NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐  NO ☐ |